UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ALAN PAWELSKY and ACE AUTO RECYCLING, INC.,

Plaintiffs,

-against-

COUNTY OF NASSAU, NEW YORK, NASSAU COUNTY DISTRICT'S ATTORNEY'S OFFICE, NASSAU COUNTY POLICE DEPARTMENT, NASSAU COUNTY POLICE DEPARTMENT PROPERTY CLERK, DETECTIVE JAMES TOBIN SHIELD No. 1285, Individually, and in his Official Capacity, DISTRICT ATTORNEY ANNE DONNELLY, Individually, and in her Official Capacity, ASSISTANT DISTRICT ATTORNEY ABIGAIL MARGULIES, Individually, and in her Official Capacity, COUNTY EXECUTIVE BRUCE BLAKEMAN, Individually, and in his Official Capacity, NASSAU COUNTY POLICE COMMISSIONER PATRICK RYDER, Individually, and in his Official Capacity, NASSAU COUNTY POLICE OFFICERS/DETECTIVE INVESTIGATORS "JOHN DOE" #1-50, Individually, and in their Official Capacity (the name John Doe being fictitious, as the true names are presently unknown),

Defendants.

-------------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

**ECF CASE**

Plaintiffs ALAN PAWELSKY and ACE AUTO RECYCLING, INC., by his attorneys, COHEN & FITCH LLP and STEVENSON MARINO LLP, complaining of the Defendants, respectfully alleges as follows that:

**PRELIMINARY STATEMENT**

1.     Plaintiffs bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §1983, 42 U.S.C. §1988, and New York State laws for civil

rights violations secured by the Constitutions of the United States and the State of New York, as well as related claims under New York State law.

2.    This action represents one of the most severe and gross violations of the Constitution of the United States. Specifically, the County of Nassau acting through its District Attorneys and Police Department seized the entirety of a reputable business that was earning over $100 million in revenue annually without: (1) providing any basis or explanation for the seizures; (2) providing evidence of *any crime*, let alone a crime justifying the seizure of a $100 million dollar business; (3) providing any notice or basis at all for the seizure of approximately $3.3 million from a business bank account; (4) providing any notice or basis at all for the seizure of approximately $4.3 million from one of Plaintiffs' customers;  or (4) ever charging anyone with even a violation, let alone a crime.

3.    As more fully described herein, Plaintiff Alan Pawelsky ("Pawelsky") is the sole shareholder of Plaintiff Ace Auto Recycling ("Ace" or "Ace Auto"). Despite being wrongfully targeted by Nassau County, Pawelsky is actually a real American success story. Since 2013, when Plaintiff Alan Pawelsky founded Ace Auto, his company has specialized in the recycling of automobile parts. At no time in its entire existence, did Ace or its owner Alan Pawelsky ever knowingly purchase, possess, or sell stolen auto parts. While the industry is rife with thieves and dishonest merchants, Plaintiffs have always refused to engage or transact with anyone suspected to be selling stolen goods.

4.    Nonetheless, the Nassau County Defendants applied for and executed search warrants on or about December 14, 2022 based on false and/or misleading information. Defendants then unlawfully seized all of Plaintiffs' business assets, including millions of dollars in equipment and goods. In addition, Defendants seized millions of dollars from Plaintiff Ace

Auto's bank accounts and converted millions of dollars of cash, without any evidence Plaintiffs ever committed a crime.

5.      Thereafter, Defendants held press conferences falsely reporting to the general public that Plaintiffs were part of a large organized crime enterprise engaged in buying and selling stolen catalytic converters without any reliable basis to make such statements. As a direct result of these false allegations, several of Plaintiffs' customers and vendors refused to continue doing business with Ace, causing (1) the complete destruction of Ace Auto's business; (2) the destruction of Pawelsky's personal and business reputation; (3) the loss of business value of Ace Auto in excess of $100,000,000; and (4) hundreds of millions of dollars in future lost earnings.

6.      Defendants unlawfully seized Plaintiffs' property, destroyed his business, ruined his business and personal reputation, and as of the date of this Complaint, never even charged Pawelsky or Ace Auto with a crime. As a result, Defendants have withheld and are continue to withhold Plaintiffs' property for a period of almost five (5) months without providing a hearing, or any effective means to challenge the seizure, thereby denying Plaintiffs the due process and other fundamental rights secured by the laws of this State and the Constitutions of the United States and New York.

7.      Nassau County officials have admitted to news organizations that it is unclear what, if any, criminal charges will be brought, but claimed that Nassau County officials will ulitamtely get to decide what to do with the seized funds.

## **JURISDICTION**

8.      This action is brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

9.      Federal jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction over the New York State law claims is conferred by 28 U.S.C. § 1367(a), as such claims are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## VENUE

10.     Venue is properly laid in the Eastern District of New York under U.S.C. §1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

11.     Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

**Plaintiffs**

12.     Plaintiff ALAN PAWELSKY is a male adult individual and is, and was at all relevant times, a resident of Nassau County in the State of New York.

13.     Plaintiff Ace Auto Recycling, Inc., is, and was at all relevant times, a domestic corporation duly organized pursuant to the laws of the State of New York, and maintains a principal place of business located within in the State of New York.

**Defendants**

14.     Defendant, County of Nassau, is, and was at all relevant times, a County duly organized and existing under, and by virtue of, the laws of the State of New York.

15.     Defendant, County of Nassau, maintains the Nassau County Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of

a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned County of Nassau.

16.     At all relevant times, the individually named Defendants DETECTIVE JAMES TOBIN SHIELD No. 1285 and P.O.s "JOHN DOE" #1-#50 ("NCPD Defendants") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

17.     At all relevant times, Defendant PATRICK RYDER (also part of "NCPD Defendants") was and is the NASSAU COUNTY POLICE COMMISSIONER and, as such, was a "policymaker" who made and enforced the policies of the NCPD that are the subject of this action, and who acted in his capacity as Police Commissioner, agent, servant, and employee of Defendant Nassau County, within the scope of his employment as such, and under color of state law.

18.     Each and all of the acts of the NCPD Defendants alleged herein were done by said Defendants while acting within the scope of their employment by Defendant County of Nassau.

19.     Each and all of the acts of the NCPD Defendants alleged herein were done by said Defendants while acting in furtherance of their employment by Defendant County of Nassau.

20.     At all relevant times Defendant BRUCE BLAKEMAN was the County Executive for Nassau County and, as such, was a "policymaker" who made and enforced the policies of Nassau County that are the subject of this action, and who acted in his capacity as County Executive, agent, servant, and employee of Defendant County of Nassau, within the scope of his employment as such, and under color of state law.

21.     Defendant, County of Nassau, maintains the Nassau County District Attorney's Office ("NCDA"), a duly authorized public authority and/or prosecuting authority, authorized to

perform all functions of a district attorney's office as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned County of Nassau.

22.     At all relevant times Defendant ANNE DONNELLY was and is the NASSAU COUNTY DISTRICT ATTORNEY and, as such, was a "policymaker" who made and enforced the policies of the NCDA that are the subject of this action, and who acted in her capacity as NASSAU COUNTY DISTRICT ATTORNEY, agent, servant, and employee of Defendant Nassau County, within the scope of her employment as such, and under color of state law.

23.     At all relevant times Defendant ABIGAIL MARGULIES was and is an Assistant District Attorney in the NASSAU COUNTY DISTRICT ATTORNEY'S OFFICE and was working in her investigative capacity into the investigation of Plaintiffs, and advising NCPD in the search and seizure of Plaintiffs' property.  At all relevant times Defendant, ADA Margulies was acting as a duly sworn officer of the NCDA and was acting under the supervision of the NCDA and according to her duties as an investigator.

24.     At all times hereinafter mentioned, all Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York or County of Nassau.

## BACKGROUND

### A.  Alan Pawelsky

25.     Plaintiff Pawelsky was born in 1994 and raised in Lynbrook, New York.

26.     Plaintiff Pawelsky's father was a plumber and, at times, when Pawelsky was a young child, Pawelsky's father would take Pawelsky to work with him when school was closed.

27.     On those days when a young Pawelsky would accompany his father to work, he would notice that at the end of the day, his father would visit local scrap yards to recycle the leftover metal scrap pipe materials from day.

28.     The young Pawelsky saw that his father received money for scrap metal that was simply discarded by many people and Pawelsky became fascinated with the idea of colleting discarded metal.

29.     Almost immediately after obtaining his license in 2011, Pawelsky began bowing his dad's work van and collecting junk metal.

30.     Pawelsky would visit auto shops and any other business that might discard metal and collect their discarded metal. Soon, Pawelsky began posting Craigslist ads to for free metal clean up.

31.     On or about October 29, 2012, Pawelsky's hometown of Lynbrook was significant damaged during the weather event known as Superstorm Sandy.

32.     As a result of Superstorm Sandy, many homes, business, automobiles and other infrastructure was severely damaged in and around Island Park, New York.

33.     In the months following SuperStorm Sandy, Pawelsky worked seven (7) days a week, approximately fifteen (15) hours a day, driving around and collecting scrap metal generated by Superstorm Sandy.

34.     Pawelsky saved the all of the money he made following SuperStorm Sandy and now convinced that he could build a real business based on recycling scrap metals, he founded Ace Auto Recycling.

**B.  *Ace Auto Recycling***

35.     In 2013, Pawelsky founded Ace Auto Recycling Inc.

36.     Initially, Ace Auto consisted solely of Pawelsky driving around to auto and mechanic shops and asking to buy their scrap metal.

37.     Pawelsky would sell all the scrap metals he purchased each day to a number of local scrap yards.

38.     In 2013, Ace Auto obtained New York State Scrap Collector license which allowed Ace Auto to purchase auto parts and scrap metal. Around this time, Pawelsky began learning about recycling catalytic converters.

39.     Soon after, Ace Auto purchased a tow truck and also got licensed as an Immobile Vehicle Collector to pick up salvaged/junk cars.

40.     After working fifteen (15) hour days, Pawelsky would spend hours a night studying catalytic converters and learning about them in catalytic converter catalogs.

41.     In late 2013, Ace Auto leased a physical location at a property known as 3592 Hampton Road Oceanside, NY (the "Hampton Road Facility").

42.     Ace Auto would grow its business at the Hampton Road Facility from 2013-2019.

43.     Now instead of selling all the scrap metal at the end of each day, Ace Auto would bring it back to the Hampton Road facility and collect it until it had sufficient metals to load a tractor trailer. Ace Auto began selling loads of metals and at times exporting these loads of scrap metals.

44.     In around 2018, Pawelsky met a business contact who owned both an American Scrap Metal Brokerage Company (Overseas Metal Management) and an aluminum furnace in New Delhi, India (Simmar Steel) where he melted aluminum and sold the aluminum melt directly to Ford to make auto parts.

45.     As a result of this business contact, Ace Auto was able to sell aluminum at a higher price than other smaller dealers, and Ace Auto began buying and selling more aluminum, and Ace Auto's revenue really started to grow.

46.     As it was able to offer higher pricing, Ace Auto began to buy aluminum from all of the scrap yards in the tristate area, and supply Overseas Metal Management with the aluminum.

47.     Ace Auto was also buying and selling catalytic converters but its focus was on aluminum.

48.     Then, in 2019, the United States trade war with China caused the price of aluminum to decline.

49.     While aluminum pricing was declining, the prices of the precious metals found in catalytic converters (platinum, palladium, and rhodium) were increasing.

50.     As a result, Pawelsky, began shifting Ace Auto's focus from the aluminum market to the catalytic converter market.

51.     The catalytic converter market was going up every month and Ace Auto was supplying its catalytic converters to a company called T-Cat Corp.

52.     Looking to repeat the same business model it employed in the aluminum market, and already having established relationships with scrap yards in the tristate area, Pawelsky began looking for a direct connection to a smelter that dealt in catalytic converters and/or their respective precious metals.

53.     Pawelsky discovered that T Cat Corp. sold their catalytic converters to a company known as "Stillwater."

54.     In or around July of 2020, Pawelsky met a business contact named James Binando at SWC Trading Co., the company known as "Stillwater." As a result of this business contact, Ace Auto was able to negotiate and obtain a lucrative contract with Stillwater. This contract enabled Ace Auto to grow its business because it allowed Ace Auto to Assay catalytic converters as opposed to merely purchasing them. Assaying essentially allowed Ace Auto to become a broker in the industry for others that had large volumes of cats.

55.     With an Assay Lot, Ace Auto would advance money to some customers that needed cash upon receicing catalytic converters or powder. Once shipped to Stillwater, Stillwater would have a fairly quick turn around, and Ace Auto would make 3-5% for processing the materials.

56.     From the point in time that Ace Auto obtained the contract with Stillwater, Ace Auto stopped buying from the general public and only purchased materials from other companies.

57.     From 2020, until the time of the Illegal Seizures, Ace Auto only did business with other companies and would continue to invest all its profits in growing the business.

58.     Indeed, from the time Pawelsky founded Ace Auto in 2013, Ace Auto would invest almost all profits back into the business.

59.     Ace Auto required all of its customers, whether Assay or Purchase Customers, to sign contracts for Assay Lots. An example of an Assay Lot Agreement is attached as Exhibit "1." An example of a Purchase Agreement is attached as Exhibit "2."

60.     Both the Assay Lot and Purchase contracts, required Ace Auto's customers to affirm that " [t]he supplier business must not at any giving time give Ace Auto Recycling Inc. any stolen catalytic converters to assay. Ace Auto Recycling Inc. does not accept and or assay

stolen catalytic converters. By the supplier business signing this agreement this means that the supplier business will not buy stolen catalytic converters knowingly and or conduct in stealing catalytic converters." See  Exhibits "1" and "2."

61.     As a result of the contract with Stillwater, and Ace Auto's ability to offering Assaying, Ace Auto grew its business to approximately $78 million on 2021 and approximately $120 million in 2022.

### C.  *Metal Recycling Industry*

62.     The metal recycling industry is an important industry that helps to reduce waste and preserve natural resources in America.

63.     Recycling metal reduces the need for virgin metal production, which requires significant amounts of energy and can contribute to air and water pollution.

64.     In addition, metal recycling helps to reduce greenhouse gas emissions, as the production of virgin metal releases large amounts of carbon dioxide into the atmosphere.

65.     According to the Institute of Scrap Recycling Industries, metal recycling in the United States conserves enough energy to power over 18 million homes for a year, and reduces greenhouse gas emissions by the equivalent of taking 14 million cars off the road. Another important benefit of metal recycling is that it helps to create jobs and support the economy.

66.     The metal recycling industry in America employs over 150,000 people and generates billions of dollars in revenue each year. In addition, the recycling process itself requires a range of skilled workers, from truck drivers and equipment operators to scientists and engineers.

67.     According to a study by the National Institute of Standards and Technology, the economic impact of the metal recycling industry in America is significant, contributing $236 billion to the gross domestic product and supporting over 534,000 jobs.

68.     Metal recycling also plays an important role in reducing the environmental impact of mining and extraction. By recycling metal, we decrease the need for new mining operations, which has significant environmental consequences, such as deforestation, soil erosion, and water pollution. In addition, mining disrupts ecosystems and harms wildlife.

D.  *Catalytic Converter Recycling*

69.     Catalytic converters play a critical role in reducing air pollution by converting harmful emissions from vehicle exhaust into less harmful compounds.

70.     The precious metals (such as platinum, palladium, and rhodium) contained in catalytic converters are rare and expensive to mine.

71.     Recycling catalytic converters helps reduce the demand for newly mined precious metals and prevents the environmental damage associated with their extraction.

72.     In addition, recycling these converters also helps reduce the cost of producing new catalytic converters, which can ultimately benefit consumers through lower prices for replacement parts.

73.     According to a report by the International Platinum Group Metals Association, recycling provides up to 30% of the global demand for these metals, making it an important contributor to the sustainable use of these resources (IPMI, 2021).

74.     Recycling catalytic converters also helps reduce the carbon footprint associated with the production of new converters.

75.     The recycling process involves extracting the precious metals from the old converters and using them to produce new ones, which significantly reduces the energy and resources required for mining and refining new metals.

76.     This process also reduces the amount of waste generated from the manufacturing process, further contributing to environmental sustainability. A study by the European Commission found that the use of recycled precious metals in catalytic converters can lead to a reduction of up to 35% in the carbon footprint of the production process (European Commission, 2021).

77.     Therefore, recycling catalytic converters is not only important for the conservation of precious resources but also for reducing the impact of the automotive industry on the environment.

### E.  Defendants Unlawfully Obtain Search Warrants

78.     On or about December 13, 2022, the NCPD Defendants applied for several search warrants of Alan Pawelsky's home, business, personal property and personal effects.

79.     Specifically, the NCPD Defendants, including Defendant Detective James Tobin, appeared *ex parte* before the Honorable Teresa K. Corrigan to apply for several warrants to search: (1) Pawelsky's Computer; (2) Pawelsky's black 2021 GMC Sierra Pickup Truck; (3) Pawelsky's Home located at 424 West Park Ave, Long Beach NY 11561; (4) Pawelsky's Cell Phone bearing number (917) 363-7845; (5) Ace Auto's Yard located at 20C Industrial Place, Island Park, NY 11558; and (6) Ace Auto's Yard located at 4336 Industrial Place, Island Park New York 11558 (collectively, the "Search Warrant Orders").

80.     Upon information and belief, Defendant Detective James Tobin and other NCPD Defendants provided false and/or misleading information to Judge Corrigan as part of their application for the Search Warrant Orders.

81.     Specifically, upon information and belief, the NCPD Defendants falsely claimed that Plaintiffs had knowingly purchased and sold stolen catalytic converters without having any such evidence.

82.     Upon information and belief, the NCPD Defendants, including Defendant Tobin also falsely claimed that stolen catalytic converters were in Plaintiff's possession without having any such evidence.

83.     Upon information and belief, the NCPD Defendants also falsely alleged that Plaintiff was part of a large criminal organization engaged in knowingly buying and selling catalytic converters and their component parts.

84.     Upon information and belief, the NCPD Defendants illegally applied for the Search Warrant Orders at the direction of Defendants Patrick Ryder, Anne Donnelly, and/or Abigail Margulies.

**F. Unlawful Seizure of Plaintiffs' Property**

85.     Thereafter, on December 14, 2022, NCPD Defendants, at the Direction of the Nassau County District Attorney's Office, essentially seized the entirety of Plaintiff Pawelsky's recycling business Ace Auto Recycling, confiscating millions of dollars from his home and business and all of Ace Auto's machinery and equipment, effectively shutting down Ace Auto, and thereby destroying Plaintiff Pawelsky's livelihood.

86.     Specifically, the Defendants seized (1) $3,269,708.16 from a Signature Bank Account (Defendants provided no notice of this seizure and have refused to provide Plaintiffs

with a copy of the search warrant/seizure order served on Signature Bank); (2) all catalytic converters and various documents from 4336 Industrial Place; (3) all catalytic converters, raw materials, automobiles, and various processing and other business equipment from 20C Industrial Place as indicated on the two page inventory list; (4) $3,900,000 in Federal Reserve U.S. Currency from 424 West Park Avenue; (5) a 2021 Model 2500 GMC Denali bearing VIN 1GT49REY9MF20355;  (6) a 2022 Mercedes 3500 Sprinter Van seized from 20C Industrial Park; (7) a cellular phone belonging to Ace Auto; and (8) a computer that contained nearly all of Ace Auto's business records. (collectively, "the "Illegal Seizures").

87.    In addition, during the Illegal Seizures, the NCPD Defendants cut expensive machinery right out of the wall, destroying hundreds of thousands of dollars of expensive business equipment Ace Auto used in its business operations.

88.    Notwithstanding that the Search Warrant Orders only permitted the seizure of "stolen catalytic converters" and other items related to the "stolen catalytic converters", the Defendants seized all of the materials from Plaintiffs' properties without even attempting to determine whether any items may or may not have been stolen.

89.    In fact, the NCPD Defendants appeared unconcerned with whether any property was stolen and seemed only concerned with how much Plaintiffs' property was worth.

90.    Indeed, Pawelsky objected to the Illegal Seizures and advised the NCPD Defendants who certain materials belonged to (as the materials were Assay Lots), and offered to provide documentation, but the NCPD Defendants were unconcerned, and instead kept inquiring how much things were worth.

91.    Defendants seized significant amount of materials that did not belong to Plaintiffs and were merely in Ace Auto's possession pursuant to Assay Lot Agreements.

92.     Defendants confiscated these items beyond the scope and authority of the Search Warrant Orders and have already admitted they are unaware whether any of the catalytic converters taken from Plaintiffs were stolen.

93.     In fact, on December 19, 2022, Plaintiff Pawelsky voluntarily met with the Nassau County District Attorney's Office and Nassau County Detectives.

94.     During that meeting, Pawelsky, through his attorney, inquired whether any of the catalytic converters seized were stolen, and Defendant Assistant District Attorney Abigail Margulies responded that they were "still trying to figure that out."

95.     As such, the Defendants freely admitted that they confiscated Plaintiffs' property without first "figuring out" whether it was stolen property as required by the Search Warrant Orders.

96.     Furthermore, Plaintiffs' business records (which were also seized by Defendants) provide a clear paper trail of each of Ace Auto's suppliers, including their identification and a list of materials provided, as was required by New York State law at the time.

97.     The documentation also included signed agreements from each of Plaintiff Ace Auto's suppliers attesting that the materials they were providing, including the catalytic converters, were **not** stolen.

### G. *Defamatory Press Conferences*

98.     Mere hours after the Illegal Seizures, Defendants Patrick Ryder, Anne Donnelly and other Nassau County officials, held multiple press conferences falsely telling the public that Plaintiffs were buying and selling stolen catalytic converters.

99.     Specifically, Defendants claimed that Plaintiff was a part of "a criminal organization."

100.    Specifically, Defendant Anne Donnelley referring to Plaintiffs, stated "these are not simple thefts, these are criminal organizations that are profiting on a large scale."

101.    Additionally, Defendant Ryder issued a warning for scrap yard owners, who **knowingly or not**, have bought stolen catalytic converters.

102.    Specifically, Defendant Ryder stated:

> To every scrap yard that has turned a blind eye, put your glasses on because the door's going to be knocking and it's going to be the Nassau County Police.

103.    Defendant Bruce Blakeman also added, referring to Plainitffs, "crime does not pay. It may pay in the short term, but we will eventually track you down."

104.    During these press conferences, Defendants also displayed several catalytic converters seized from Ace Auto during the execution of the warrants and claimed that the catalytic converters were stolen, when in fact they were not stolen.

105.    In fact, the displayed catalytic converters were provided to Ace Auto by a reputable supplier to process pursuant to an Assay Lot Agreement.

106.    Moreover, the displayed catalytic converters were not stolen and Defendants were aware at the time they made those statements, that Defendants had no evidence that such catalytic converters were stolen.

107.    Despite making these statements about Plaintiffs and claiming all of the materials seized from Plaintiffs' property were the fruits of a crime, Defendants never arrested Plaintiff Pawelsky, nor have they ever brought charges against him or Ace Auto.

108.    Defendants already admitted that they do not know if any catalytic converters seized were stolen, let alone "knowingly stolen" – nor could they – since Plaintiffs never knowingly purchased stolen goods.

109.    In addition, upon information and belief, Defendants are in possession of significant exculpatory evidence showing that Plaintiff Pawelsky never knowingly intended Ace Auto to buy stolen goods, and in fact went out of his way to ensure Ace Auto avoided dealing with companies that might trade in stolen catalytic converters.

110.    Specifically, upon information and belief, the Defendants wire tapped Plaintiff Pawelsky's cellular phone and Defendants are in possession of several conversations Plaintiff Pawelsky had with business associates regarding his firm position not to purchase stolen materials.

111.    Further, Plaintiffs immediately ceased doing business with anyone or any company that Plaintiff Pawelsky even remotely suspected might be selling stolen materials.

112.    Despite having this exculpatory information, Defendants held several press conferences stating Plaintiffs were operating a criminal operation and engaging in widespread illegal behavior.

### H. *Permanent Destruction of Plaintiffs' Recycling Business & Reputation*

113.    Shortly after the press conference, Plaintiffs began receiving letters from Ace Auto's biggest customers and suppliers.

114.    Specifically, Stillwater, the company Plaintiff Ace Auto had a lucrative contract with, and which Ace Auto had transacted tens of million dollars of business with, sent a letter specifically citing the press conferences by Defendants as the reason they were immediately ceasing to do business with Ace Auto.

115.    Defendants also seized money owed to Plaintiff Ace Auto from Stillwater on or about February 14, 2023.

116.     This money was owed to Ace Auto for raw materials Ace Auto transferred to Stillwater before the search warrants were executed.

117.     Upon information and belief, the Defendants seized approximately $4.3 million dollars owed to Plaintiff Ace Auto by Stillwater on or about February 14, 2023.

118.     Plaintiffs received no notice of this seizure and Defendants have refused to provide Plaintiffs with copies of the search warrant/seizure orders served on Stillwater.

119.     Plaintiffs also received no notice of the seizure of the monies taken from his Signature Bank Accounts and Defendants have also refused to provide Plaintiffs with copies of the search warrant/seizure order served on Signature Bank.

120.     Furthermore, a significant portion of the money seized from Stillwater, however, is actually owed to other companies, who contracted with Plaintiff Ace Auto pursuant to Assay Lot Agreements to process their catalytic converters or powders and sell the raw materials to Stillwater on their behalf.

121.     As a result, Plaintiff Ace Auto now owes these other companies millions of dollars.

122.     Defendants seized the money from Stillwater despite having no evidence that any of the raw materials sent to Stillwater by Ace Auto was processed from stolen catalytic converters or other parts.

### I.  *Defendants Continued Refusal to Return Plaintiffs' Property*

123.     Defendants refuse to return Plaintiffs' property and have held it since December 14, 2022 without any indication of when their indefinite "investigation" will be complete.

124.     Specifically, on February 7, 2023, Plaintiff Pawelsky, through counsel, demanded the return of all property that was taken in the Illegal Seizures.

125.     On February 13, 2023, Defendant District Attorney Anne Donnelly responded through Assistant District Attorney Abigail Margulies that the property would not be returned because all of the property demanded was "seized pursuant to court-authorized search warrants that were issued as part of an active and ongoing criminal investigation." The Letter from Anne Donnelly is attached as Exhibit "3."

126.     Defendant District Attorney Donnelly did not assert that any of the property taken in the Illegal Seizures was stolen. Now, almost five (5) months after the Illegal Seizures, the Nassau County Defendants continue to refuse to return Plaintiffs' property, all without due process.

127.     Meanwhile, the materials taken from Plaintiffs have gone down in value, as the markets for palladium, platinum, and rhodium (the precious metals found in catalytic converters) have all significantly dropped.

128.     As a result, even if Plaintiff Ace Auto was to get back all of its materials today, Ace Auto would still have millions of dollars in losses because it was prevented from selling those materials when prices for those materials were higher.

129.     As a result, Plaintiffs have been denied due process, having no recourse, short of filing this instant lawsuit, to challenge the Illegal Seizures.

## FEDERAL CLAIMS

### FIRST CLAIM FOR RELIEF
### DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983

130.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

131.     All of the aforementioned acts of Defendants, their agents, servants and employees, were carried out under the color of state law.

132.    All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

133.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers with all the actual and/or apparent authority attendant thereto.

134.    The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the County of Nassau and the Nassau County Police Department, all under the supervision of ranking officers of said department.

135.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**SECOND CLAIM FOR RELIEF**
**UNLAWFUL SEARCH, SEIZURE, AND ENTRY UNDER 42 U.S.C. § 1983**

136.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

137.    As a result of the aforesaid conduct by Defendants, Plaintiff Paweksly's home, business, vehicle, possessions and personal effects were illegally and improperly entered without consent, a valid warrant, probable cause, privilege or consent, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

138.    As a result of the aforesaid conduct by the Defendants, Plaintiff Pawelsky's home, businesses, and vehicles were entered illegally at a time not prescribed in the warrants, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

139.    As a result of the aforesaid conduct by the Defendants, Plaintiffs were not provided with copies of said warrants upon his request, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

140.    As a result of the aforesaid conduct by the Defendants, Plaintiffs were subjected to illegal searches and seizures pursuant to invalid search warrants obtained with stale, false, and/or misleading information, in violation of their constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States

141.    As a result of the aforesaid conduct by the Defendants, Plaintiffs were subjected to illegal searches and seizures pursuant to search warrants for which probable cause was lacking, in violation of their constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

142.    As a result of the aforesaid conduct by the Defendants, Plaintiffs were subjected to illegal searches and seizures pursuant to invalid search warrants issued upon an affidavit containing false and/or recklessly inaccurate information and/or which omitted information (including exculpatory information) upon which a judge would have concluded there was no probable cause for its issuance, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution.

143.     As a result of the aforesaid conduct by the Defendants, Plaintiffs were subjected to unreasonable seizures of their property.

144.     Defendants have failed to return Plaintiffs' property, and/or provide any evidence to justify the continued withholding of such property without any recourse to challenge the search and seizure of said property.

145.     As a result of the aforesaid conduct by Defendants, Plaintiff Pawelsky's home and possessions were illegally and improperly searched without any warrant, probable cause, privilege or consent, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States the United States for which he has been permanently harmed.

**THIRD CLAIM FOR RELIEF**
**"STIGMA PLUS" CLAIM UNDER 42 U.S.C. § 1983**

146.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

147.     The information provided by Defendants to the press was materially false and misleading.

148.     As a result of false and misleading information provided to the press, Plaintiff Alan Pawelsky and his company Ace Auto Recycling, Inc. was the subject of extensive and highly prejudicial news coverage, including stories in Newsday, Bronx News 12, News 12 Long Island, Facebook, LI Herald, CBS News New York, Huntington Now, Daily Voice, The North Shore Leader, Patch, and ABC 7 News New York, amongst others..

149.     The accusations regarding Pawelsky and his company being involved in a criminal enterprise are plainly sufficiently derogatory to injure his reputation.

150.    As a result of Defendants' statements to the press, Plaintiffs' reputations were severely and permanently damaged. To this day, the story of Plaintiff Pawelsky's alleged involvement in a criminal organization and being involved in a crime are the first stories that appear when doing a Google search of Plaintiff Pawelsky's name on the Internet.

151.    As a result of Defendants' statements to the press, Plaintiff lost tens of millions of dollars of business and continues to lose money every day.

152.    Specifically, several companies' Plaintiffs worked with, including Stillwater have refused to continue to work with Plaintiffs as a direct result of the false accusations made by Defendants.

153.    This material, government-imposed burden imposed on Plaintiff's career was in addition to and temporarily proximate to the stigma generated by the false and misleading accusations.

154.    As a result of Defendants' statements to the press, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, has been the subject of ridicule, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his business, and lost his livelihood.

**FOURTH CLAIM FOR RELIEF**
**FAILURE TO INTERCEDE UNDER 42 U.S.C. § 1983**

151.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

152.    Defendants had an affirmative duty, and the opportunity to intercede, when Plaintiffs' constitutional rights were being violated when some of the Defendants: (1) presented false and/or or misleading evidence to obtain the aforementioned search warrants; (2) seized

materials from Plaintiff beyond those authorized by the search warrants; (3) provided false and/or misleading information to the press about Plaintiffs, and (4) violated Plaintiffs' other rights secured by the constitutions of United States and State of New York.

153.    Defendants further violated Plaintiffs' constitutional rights when they failed to intercede and prevent the violation or further violation of Plaintiffs' constitutional rights and the injuries or further injuries caused as a result of said failure.

154.    As a result of the failure to intercede when Plaintiffs' constitutional rights were being violated in Defendants' presence, Plaintiffs sustained, *inter alia*, economic injuries, emotional injuries, and Plaintiff Pawelsky was humiliated without justification.

### FIFTH CLAIM FOR RELIEF VIOLATION OF
### DENIAL OF DUE PROCESS UNDER 42 U.S.C. § 1983

155.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

156.    The Defendants violated the Due Process Clause of the Fourteenth and Fifth Amendments to the Constitution when they searched and seized Plaintiffs' property based on false and/or misleading information.

157.    The Defendants violated and continue to violate the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution by continuing to withhold Plaintiffs' property indefinitely without providing notice, a hearing, or an opportunity to challenge Defendants' search, seizure, and continued retention of their property.

158.    As a direct and proximate result of the foregoing, Plaintiffs sustained, *inter alia*, severe economic harm, emotional distress, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of constitutional rights.

## SIXTH CLAIM FOR RELIEF
## UNCONSTITUTIONAL TAKING UNDER 42 U.S.C. § 1983

159.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

160.    The Defendants violated the Takings Clause of the Fifth Amendment to the Constitution by seizing Plaintiffs' property without justification and/or providing just compensation.

161.    The Defendants seized Plaintiffs' property and falsely claimed it was stolen, or the proceeds from the sale of stolen goods, despite having no proof of such claims.

162.    The Defendants have converted millions of dollars of Plaintiffs' money and have never even charged Plaintiffs with a crime.

163.    Defendants' actions constitute an unconstitutional taking pursuant to the Fifth and Fourteenth Amendments to the United States Constitution of the United States.

164.    As a direct and proximate result of the foregoing, Plaintiffs sustained, *inter alia*, severe economic harm, emotional distress, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of constitutional rights.

## SEVENTH CLAIM FOR RELIEF
## EXCESSIVE FINES UNDER 42 U.S.C. § 1983

165.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

166.    The Defendants violated Plaintiffs' Eight Amendment right to be free from excessive fines and/or cruel and unusual punishments.

167.     Defendants seized all of Plaintiffs' property without first determining whether that property was stolen or whether they were the proceeds of stolen goods.

168.     Defendants also destroyed expensive machinery and confiscated materials used for operating Plaintiffs' business.

169.     Plaintiff Pawelsky disputes having any knowledge of any stolen materials in his possession.

170.     However, even if a small portion of the goods in Plaintiffs' possession at the time of the seizures were unknowingly purchased from individual(s)s who had stolen them (which Plaintiff does not believe to be the case), the vast amount of money and materials seized were not stolen, nor would they be the proceeds of stolen property.

171.     As a result, the grossly disproportionate amount seized compared to any miniscule unknowing possession of stolen goods is an excessive fine prohibited by the Eight and Fourteenth Amendments to the United States Constitution of the United States.

172.     Further, the seizure of Plaintiff Pawelsky's property and the continued withholding of this property by Defendants which has completely destroyed his livelihood is also violative of the Eight and Fourteenth Amendments to the United States Constitution of the United States prohibition of excessive fines and/or cruel and unusual punnishment.

## EIGHTH CLAIM FOR RELIEF FOR
## MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

173.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

174.     Defendants unlawfully searched and seized Plaintiffs' property without justification causing Plaintiff Pawelsky severe economic injuries in violation of his constitutional rights.

175.    The acts complained of were carried out by the aforementioned individual Defendants and subordinate officers of the NCPD and NCDA in their capacities as officers and officials, with all the actual and/or apparent authority attendant thereto.

176.    The acts complained of were carried out by the aforementioned individual Defendants and subordinate officers, officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the County of Nassau.

177.    The acts complained of were carried out by Patrick Ryder, the Commissioner of the Nassau County Police Department, a policy maker for the County of Nassau.

178.    The acts complained of were carried out by Anne Donnelly, the Nassau County District Attorney, a policy maker for the County of Nassau.

179.    The failure to train officers and employees, and the failure to supervise and/or discipline staff responsible for these acts are so institutionalized as to represent a policy or custom of unconstitutional violations that have resulted in the deprivation of Plaintiffs' rights.

180.    The aforementioned customs, policies, usages, practices, procedures and rules of the County of Nassau, the NCPD, and the NCDA, include, but are not limited to, the following unconstitutional practices:

     i.     Applying for search warrants based on false and/or misleading information;

     ii.     Seizing property beyond the scope allowed by a search warrant;

     iii.     Imposing excessive fines on alleged criminal behavior;

     iv.     Executing search warrants without probable cause or justification;

     v.     Unreasonably withholding property with providing a prompt means to challenge the seizure;

vi.   Falsely reporting alleged criminal behavior in an effort to cover up an unlawful seizure;

vii.   Holding press conferences regarding ongoing criminal investigations to tarnish the reputations of targets that have not even been charged with a crime;

viii.   Executing a search warrant and seizing alleged stolen goods before having any evidence to prove such goods are stolen;

181.   The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct by the Defendants and from the statistics, records and reports maintained by Defendants' agencies.

182.   The foregoing customs, policies, usages, practices, procedures and rules of the County of Nassau, the NCPD, and the NCDA constituted a deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

183.   The foregoing customs, policies, usages, practices, procedures and rules of the County of Nassau, the NCPD, and the NCDA were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as alleged herein.

184.    The foregoing customs, policies, usages, practices, procedures and rules of the County of Nassau, the NCPD, and the NCDA were the moving force behind the constitutional violations suffered by Plaintiff as alleged herein.

185.   As a result of the foregoing customs, policies, usages, practices, procedures and rules of the County of Nassau, the NCPD, and the NCDA, Plaintiff Pawelsky's property was searched without probable cause or any legal basis and subjected to seizure in violation of his constitutional rights.

186.    Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiff Pawelsky.

187.    Defendants, collectively and individually, while acting under color of state law, acquiesced in and encouraged a pattern of unconstitutional conduct, and were directly responsible for the violation of the constitutional rights of Plaintiff Pawelsky.

188.    All of the foregoing acts by Defendants deprived Plaintiff of federally protected rights, including, but not limited to, the right:

      i.    Not to be deprived of liberty without due process of law;

      ii.    Not to be deprived of property without due process of law

      iii.    To be free from search, and seizure not based upon probable cause;

      iv.    To receive equal protection under the law;

## **PENDANT NEW YORK STATE CLAIMS**

189.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

190.    On or about February 23, 2023, and within (90) days after the claim herein accrued, the Plaintiffs duly served upon, presented to and filed with Defendant County of Nassau, a Notice of Claim setting forth all facts and information required under the General Municipal Law § 50 €.

191.    Thereafter, on or about March 14, 2023, and within (90) days after the claim herein accrued, the Plaintiffs duly served upon, presented to and filed with Defendant County of Nassau, a supplemental Notice of Claim setting forth all facts and information required under the General Municipal Law § 50 (e).

192.    Defendant County of Nassau has wholly neglected or refused to make an adjustment or payment thereof and more than thirty (30) days have elapsed since the presentation of such claim as aforesaid.

193.    Defendant County of Nassau has not demanded a hearing pursuant to General Municipal Law § 50-h.

194.    This action was commenced within one (1) year and ninety (90) days after the causes of action herein accrued.

195.    Plaintiffs have and/or will comply with all conditions precedent to maintaining the instant action.

196.    This action falls within one or more of the exceptions as outlined in C.P.L.R. § 1602.

## FIRST CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## REPLEVIN

197.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

198.    Defendants used illegal Search Warrant Orders to seize Plaintiffs' property.

199.    Defendants were not justified in taking any of the property taken pursuant to Search Warrant Orders.

200.    Even if the Defendants were justified in taking some of the property (which Plaintiffs dispute), Defendants took property belonging to Plaintiffs that was well beyond the scope and authorization of the search warrant orders.

201.    As a direct and proximate result of the foregoing, Plaintiffs sustained, *inter alia*, severe economic harm, emotional distress, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of rights.

## SECOND CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## <u>CONVERSION</u>

202.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

203.    Defendants used illegal Search Warrant Orders to seize laintiffs' property.

204.    Even if Defendants could articulate a justification for taking some of the property, Defendants took property belonging to Plaintiffs that was far beyond the scope and authorization of the Search Warrant Orders.

205.    The Defendants have intentionally exercised control over property belonging to the Plaintiffs and to the detriment of Plaintiffs.

206.    As a direct and proximate result of the foregoing, Plaintiffs sustained, *inter alia*, severe economic harm, emotional distress, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of rights.

207.     As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## <u>UNJUST ENRICHMENT</u>

208.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

209.    Defendants committed the unlawful acts herein alleged willfully, intentionally, maliciously, fraudulently and with conscious disregard for the Plaintiffs' rights for the sole purpose of unjustly enriching County of Nassau, the NCPD, and/or the NCDA.

210.    The Defendants have been unjustly enriched at the expense of Plaintiffs.

**FOURTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

211.    Plaintiff Pawelsky repeats, reiterates, and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

212.    The aforementioned conduct of Defendants was extreme and outrageous, and exceeded all reasonable bounds of decency.

213.    The aforementioned conduct was committed by Defendants while acting within the scope of their employment by Defendants County of Nassau, NCPD, and/or NCDA.

214.    The aforementioned conduct was committed by Defendants, while acting in furtherance of their employment by Defendant County of Nassau, NCPD, and/or NCDA.

215.    The aforementioned conduct was intentional and done for the sole purpose of causing severe emotional distress to Plaintiff Pawelsky.

216.    As a result of the aforementioned conduct, Plaintiff Pawelsky suffered severe emotional distress, mental injury, together with embarrassment, humiliation, shock, fright and loss of freedom.

217.    As a result of the aforementioned conduct, Plaintiff Pawelsky has been damaged in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

218.    Plaintiff Pawelsky repeats, reiterates, and realleges each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

219.    The aforementioned conduct of Defendants was extreme and outrageous, and exceeded all reasonable bounds of decency.

220.    The aforementioned conduct was committed by Defendants while acting within the scope of their employment by Defendants County of Nassau, NCPD, and/or NCDA.

221.    The aforementioned conduct was committed by Defendants, while acting in furtherance of their employment by Defendant County of Nassau, NCPD, and/or NCDA.

222.    The aforementioned conduct was done negligently and with deliberate indifference to the rights of Plaintiff, causing him severe emotional distress.

223.    As a result of the aforementioned conduct, Plaintiff Pawelsky suffered severe emotional distress, mental injury, together with embarrassment, humiliation, shock, fright and loss of freedom.

224.    As a result of the aforementioned conduct, Plaintiff Pawelsky has been damaged in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW**
**NEGLIGENT HIRING/TRAINING/SUPERVISION/RETENTION**

225.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

226.    Defendants County of Nassau, NCPD, and/or NCDA selected, hired, trained, retained, assigned and supervised all members of their respective offices and departments, including the Defendants individually named above.

227.    Defendant County of Nassau, NCPD, and/or NCDA was negligent and careless when it selected, hired, trained, retained, assigned, and supervised all their members and employees.

228.    Due to the negligence of the Defendants as set forth above, Plaintiff Pawelsky suffered mental injury, economic harm, together with embarrassment, humiliation, shock, fright, and loss of property.

229.    Due to the negligence of the Defendants as set forth above, Plaintiff Ace Auto suffered economic harm, reputational damage, and loss of property.

230.    As a result of the foregoing, Plaintiffs are entitled to compensatory damages and are further entitled to punitive damages against the individual Defendants.

## SEVENTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## DEFAMATION

231.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

232.    Only hours after the Illegal Seizures, Defendants Anne Donnelly, Patrick Ryder,Abigail Margulies, James Tobin, Bruce Blakeman and other Nassau County officials and officers held press conferences discussing the materials seized from Plaintiffs.

233.    During these conferences, Defendants made numerous false statements about Plaintiff Paweksly and Ace Auto.

234.    Specifically, the Defendants falsely stated, inter alia, that Plaintiff 1) was part of a large criminal organization, 2) that all the catalytic converters and materials seized from Plaintiffs were stolen, 3) that Plaintiff knew the catalytic converters were stolen, 4) and continued to make disparaging statements about Plaintiff Pawelsky's character.

235.    Defendants either knew these statements were false or recklessly disregarded the truth or falsity of these statements at the time they made them

236.    In addition, upon information and belief, the aforementioned Defendants defamed Plaintiffs by communicating, through email, text, phone, and/or other forms of communication, the above listed false information to several news and media outlets including the Newsday, Bronx News 12, News 12 Long Island, Facebook, LI Herald, CBS News New York, Huntington

Now, Daily Voice, The North Shore Leader, Patch, and ABC 7 News New York, amongst others.

237.    Defendants knew these statements were false or recklessly disregarded the truth or falsity of these statements at the time they made them.

238.    Specifically, Defendants were in possession of exculpatory material showing Plaintiffs never intended to purchase stolen goods.

239.    Defendants knew or should have known that such statements had the tendency to expose the Plaintiffs to public hatred, contempt, ridicule or disgrace.

240.    As a result of these false statements, Plaintiffs were exposed to public hatred, contempt, ridicule or disgrace.

241.    Defendants were motivated by actual malice in making these false statements about Plaintiffs.

242.    As a result, these false statements were a substantial factor in causing Plaintiffs to suffer extreme financial loss.

243.    As a result of these false and defamatory statements, Plaintiffs suffered severe injuries and damage to their profession and reputation.

244.    As a result of the aforementioned conduct, Plaintiff Pawelsky suffered mental injury, together with embarrassment, humiliation, shock, fright, loss of freedom, and loss of wages.

245.    As a result of the aforementioned conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## <u>VIOLATIONS OF THE NEW YORK STATE CONSTITUTION</u>

246.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

247.    Defendants' conduct breached the protections guaranteed to Plaintiffs by the New York State Constitution, including but not limited to, Article 1, §§ 1, 5, 6, and 11, and including the following rights:

        a.    freedom from excessive fines and cruel and unusual punishment; and

        b.    freedom from deprivation without due process of law.

248.    As a direct and proximate result of Defendants' deprivations of Plaintiffs' rights, privileges, and immunities guaranteed by the New York State Constitution, Plaintiffs suffered irreparable economic harm and damages set forth above.

## NINTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## <u>TORTIOUS INTETERFERENCE WITH CONTRACT</u>

249.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

250.    Before December 14, 2022, Plaintiff Ace Auto had a contract with Stillwater, wherein Ace Auto would prepare and deliver Assay Lots to Stillwater from third parties, which Plaintiff Ace Auto also had contracts with.

251.    Plaintiff Ace Auto used the equipment seized during the execution of the search warrants to prepare the Assay Lots to send them to Stillwater.

252.    On December 14, 2022 Defendants seized and/or destroyed nearly all of Plaintiff Ace Auto's equipment.

253.    Thereafter, Defendants made false reports to the press claiming Plaintiffs were part of a criminal organization buying and selling stolen catalytic converters.

254.    As a direct result of the false statements made to the press, Stillwater sent Plaintiff Ace Auto a letter immediately suspending their business relationship citing the media reports and stating that those reports created "the potential for legal liability and reputational risk" which violated their contractual relationship. See Letter attached as Exhibit "4."

255.    In addition, Stillwater informed Ace Auto that it would withhold payments from Assay Lots that had been processed but had not been paid.

256.    At the time of the Illegal Seizures, Plaintiff Ace Auto had sent multiple Assay Lots of behalf of other Ace Auto customers with Assay Lot Agreements.

257.    Defendants seized the money owed to Ace Auto on those lots from Stillwater, and upon information and belief presented false facts about Plaintiffs in the seizure warrant it presented to Stillwater. As a result, Plaintiff Ace Auto was therefore unable perform its obligations under those contracts as well.

258.    As a direct result of the Illegal Seizures, Plaintiff Ace Auto was no longer able to operate its business and fulfill its obligations on any of the contracts it had previously entered into.

259.    Defendants were aware of the aforementioned contracts between Plaintiff Ace Auto and the aforementioned businesses.

260.    Defendants intentionally interfered with these contracts without justification, by making false reports to the press, seizing moneys owed to third parties, and destroying Plaintiff Ace Auto's equipment.

261.   As a result of the forgoing, Plaintiff Ace Auto has suffered severe and ongoing economic harm.

**WHEREFORE**, the Plaintiff respectfully requests judgment against Defendants as follows:

i.   an order requiring Defendants return of all of Plaintiffs' seized property;

ii.   an order awarding actually compensatory damages in an amount to be determined at trial but not less than $100,000,000;

iii.   an order awarding punitive damages in an amount to be determined at trial;

iv.   reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

v.   directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs and disbursements of this action.

Dated: New York, New York
       April 28, 2023

BY:   _____/S_____
      GERALD COHEN
      COHEN & FITCH LLP
      *Attorneys for Plaintiff*
      233 Broadway, Suite 900
      New York, N.Y. 10279
      (212) 374-9115
      gcohen@cohenfitch.com


      STEVENSON MARINO LLP
      *Attorneys for Plaintiff*


      By:   s/J.R. Stevenson____
            J.R. Stevenson

      445 Hamilton Avenue Suite 1500
      White Plains, New York 10038
      Tel: (212) 939-7588
      Email: jrs@stevensonmarino.com